# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRY MCCLEAVE, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT – CLASS ACTION** |
| MRO CORPORATION and DEACONESS HEALTH SYSTEM, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Terry Mccleave ("Plaintiff"), on behalf of all others similarly situated, by and through undersigned counsel, brings this Class Action Complaint against Defendants MRO Corporation ("MRO") and Deaconess Health System, Inc. ("DHS") (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following upon information and belief, and based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively "Private Information") that was impacted in a data breach (the "Data Breach" or the "Breach").

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

2.      Plaintiff's claims arise from Defendants' failure to properly secure and safeguard Private Information that was entrusted to them, and their accompanying responsibility to store and transfer that information.

3.      Defendant MRO is a clinical data exchange service company, based in Pennsylvania, that "expertly" manages and releases clinical data for hospitals and health systems[2] ("Clients" or "Defendant's Clients"), including to Defendant DHS.

4.      Defendant DHS "is the premiere provider of health care services to a population of more than 1.5 million in southwestern Indiana, western Kentucky and southeastern Illinois. Serving a population of more than 1.5 million residents, the system consists of 22 wholly owned, joint ventured, sponsored or affiliated hospital locations situated throughout the Tri-State."[3] Defendant DHS contracts with Defendant MRO to handle patients' release of information requests, which allow health care providers to share sensitive patient information with third parties with a patient's authorization.[4]

5.      Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on their affirmative representations to Plaintiff and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

---

[2] *About Us,* MRO CORP., https://mrocorp.com/about-us/ (last visited Mar. 20, 2026).

[3] *About Us,* DEACONESS, https://www.deaconess.com/about-us (last visited Mar. 20, 2026).

[4] Houston Harwood, *Deaconess patients' sensitive data stolen in vendor breach*, EVANSVILLE COURIER & PRESS (updated Mar. 20, 2026), https://www.courierpress.com/story/news/local/2026/03/19/deaconess-health-data-breach-exposes-kentucky-patients-ssns-henderson-morganfield-news-hippa-credit/89196026007/ .

6. It has been reported that MRO's cloud-based file-sharing platform was accessed by an unauthorized actor on January 13, 2026, and that an unspecified number of files were exfiltrated from the platform.[5] As a result of the Data Breach, an unauthorized third-party was able to access and copy files containing the sensitive Private Information of Plaintiff and Class Members.

7. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: names, dates of birth, Social Security numbers, medical record numbers, dates of service, health insurance identification numbers, and medical records related to treatment received at DHS's facilities.[6]

8. Defendants have not yet issued individualized notice letters to impacted individuals.

9. Defendants failed to take precautions designed to keep individuals' Private Information secure.

10. Defendants owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the Private Information, yet breached their duty by failing to implement or maintain adequate security practices.

11. Defendants admit that information in their system was accessed by unauthorized individuals, though they provided little information regarding how the Data Breach occurred.

---

[5] *Id.*

[6] *Id.*

12. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiff and Class Members have suffered irreparable harm. Plaintiff and Class Members have lost the ability to control their private information and are subject to an increased risk of identity theft.

13. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information they maintained for Plaintiff and Class Members, causing the exposure of Plaintiff and Class Members' Private Information.

14. As a result of Defendants' inadequate digital security and notice process, Plaintiff and Class Members' Private Information was exposed to criminals. Plaintiff and the Class Members have suffered and will continue to suffer injuries including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal and financial information.

15. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiff and Class Members of the Data Breach. Defendants' conduct amounts to at least negligence and violates federal and state statutes.

16. Plaintiff brings this action individually and on behalf of a Nationwide Class of similarly situated individuals against Defendants for: negligence; negligence *per se*; unjust enrichment, breach of implied contract, and breach of third-party beneficiary contract.

17. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

*Plaintiff*

18. Plaintiff is a citizen and resident of New Harmony, Indiana.

*Defendants*

19. Defendant MRO is a corporation maintaining its principal place of business at 1000 Madison Avenue, Suite 100, Norristown, Pennsylvania 19403.

20. Defendant DHS is a nonprofit corporation maintaining its principal place of business at 600 Mary St., Evansville, Indiana 47747.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of Class Members is more than 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

22. This Court has personal jurisdiction over Defendants because Defendant MRO is headquartered in this District, regularly conducts business in this District, and has sufficient minimum contact in this District.

23. Venue is proper in this Court because Defendant MRO's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

24. Defendant MRO is a clinical data exchange service company, based in Pennsylvania, that manages and releases clinical data for hospitals and health systems[7], including to Defendant DHS.

25. Defendant DHS is a health care services provider, consisting of 22 wholly owned, joint ventured, sponsored or affiliated hospital locations, that serves more than 1.5 million individuals in southwestern Indiana, western Kentucky and southeastern Illinois.[8] Defendant DHS contracts with Defendant MRO to handle patients' release of information requests, which allow health care providers to share sensitive patient information with third parties with a patient's authorization.[9]

26. Upon information and belief, Defendants made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

---

[7] *MRO Corp. About Us*, *supra* note 2.

[8] *Deaconess About Us, supra* note 3.

[9] Harwood, *Deaconess Patients' Sensitive Data Stolen*, *supra* note 4.

27. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

28. As a result of collecting and storing the Private Information of Plaintiff and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff and the Class Members' Private Information from disclosure to third parties.

## B. The Data Breach

29. It has been reported that MRO's cloud-based file-sharing platform was accessed by an unauthorized actor on January 13, 2026, and that an unspecified number of files were exfiltrated from the platform.[10] As a result of the Data Breach, an unauthorized third-party was able to access and copy files containing the sensitive Private Information of Plaintiff and Class Members.

30. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: names, dates of birth, Social Security numbers, medical record numbers, dates of service, health insurance identification numbers, and medical records related to treatment received at DHS's facilities.[11]

31. Defendants have not yet issued individualized notice letters to impacted individuals.

32. Defendants failed to take precautions designed to keep individuals' Private Information secure.

---

[10] *Id.*

[11] *Id.*

33. Upon information and belief, the cyberattack was targeted at Defendants due to their status as entities that collect and maintain substantial amounts of sensitive Private Information on their computer networks and/or systems.

34. Upon information and belief, because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendants that included the Private Information of Plaintiff and Class Members.

35. As evidenced by the Data Breach's occurrence, the Private Information contained in Defendant MRO's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

36. Plaintiff believes that the Private Information of Class Members was accessed and stolen in the Data Breach and is currently or will become available for sale on the dark web because that is the *modus operandi* of cybercriminals that perpetrate these types of cyberattacks.

37. Defendants had obligations created by the FTC Act, HIPAA, contract, state and federal law, common law, and industry standards to keep Plaintiff and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

## C. Data Breaches Are Preventable

38. Data breaches are preventable.[12] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[13] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[14]

---

[12] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy L. Thomson ed., 2012).

[13] *Id.* at 17.

[14] *Id.* at 28.

39. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

40. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

41. To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, patients and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

42. To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates;

- Use threat and vulnerability management;

- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[15] *Id.* at 3-4.

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities;

- Hunt for brute force attempts;

- Monitor for cleanup of Event Logs;

- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall;

- Enable tamper protection;

- Enable cloud-delivered protection;

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[16]

43. Given that Defendants were storing the Private Information of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

44. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiff and Class Members.

---

[16] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT SECURITY BLOG (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

**D. Defendants' Failure to Prevent, Identify, and Timely Report the Data Breach**

45.     The Private Information that Defendants allowed to be exposed in the Data Breach are the types of private information that Defendants knew or should have known would be the target of cyberattacks.

46.     Despite their own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[17] Defendants failed to disclose that their systems and security practices, or those of third-party vendors, were inadequate to reasonably safeguard individuals' Private Information.

47.     The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[18] Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves.

48.     Here, Defendants have waited more than two months after being made aware of the Data Breach to notify impacted individuals.

**E. Defendants Knew or Should Have Known of the Risk Because Healthcare Companies in Possession of Private Information Are Particularly Susceptible to Cyber Attacks**

49.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting companies that collect and store Private Information, like Defendants, preceding the date of the breach.

---

[17] *Protecting Personal Information: A Guide for Business,* FED. TRADE COMM'N (Oct. 2016)*,* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Mar. 20, 2026).

[18] *Id.*

50.     Data breaches, including those perpetrated against companies that store Private Information in their systems, have become widespread.

51.     According to the 2023 Annual Data Breach Report, the number of data compromises in 2023 (3,205) increased by 78 percentage points compared to 2022 (1,801).[19] The ITRC set a new record for the number of data compromises tracked in a year, up 72 percentage points from the previous all-time high in 2021 (1,860).[20]

52.     This trend continued in 2024, when 3,158 data breaches occurred exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year. [21] From 2018 until 2023, healthcare companies storing PHI, such as Defendants, experienced the most data breaches among all measured industries.[22] In 2024, the healthcare industry was the second most targeted industry for data compromises behind only financial services.[23]

53.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), and 23andMe, Inc. (20 million

---

[19] *2023 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (2024), https://www.idtheftcenter.org/ publication/2023-data-breach-report/.

[20] *Id.*

[21] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 28, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report.

[22] *Id*.

[23] *Id*.

records, October 2023), Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

54. Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

55. Defendants knew and understood unprotected or exposed Private Information in the custody of healthcare companies, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

56. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

57. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

58. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

59. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

60. As a healthcare company in custody of Plaintiff's and Class Members' Private Information, Defendants knew, or should have known, the importance of safeguarding Private Information entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

**F. Value of Private Information**

61. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[25]

---

[24] 17 C.F.R. § 248.201 (2013).

[25] *Id.*

62.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[26]

63.     For example, PII can be sold at a price ranging from $40 to $200.[27] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[28]

64.     PII can sell for as much as $363 per record according to the Infosec Institute.[29] PII is particularly valuable because criminals can use it to target victims with frauds and scams.

65.     Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

66.     Social Security numbers, which were compromised for some of the Class Members as alleged herein, for example, are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

67.     A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to

---

[26] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[27] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[28] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[29] *See* Ashiq JA, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[30]

68.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

69.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

70.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[32]

---

[30] SOCIAL SECURITY ADMINISTRATION, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Mar. 20, 2026).

[31] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[32] *Medical I.D. Theft*, EFRAUDPREVENTION, https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20yo ur,credit%20report%20may%20be%20affected (last visited Mar. 20, 2026).

71. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

72. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[33] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[34] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[35]

73. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.

74. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover

---

[33] A. H. Seh et al., *Healthcare Data Breaches: Insights and Implications*, 8 HEALTHCARE 133 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636.

[34] Steve Alder, December 2019 Healthcare Data Breach Report, THE HIPAA JOURNAL (Jan. 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/

[35] Robert Huber, *Operation Epic Fury: Why exposure data changes everything about Iran's cyber-kinetic campaign*, TENABLE BLOG (Mar. 17, 2026), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/.

erroneous information has been added to their personal medical files due to the thief's activities."[36]

75. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[37] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[38]

76. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, Social Security numbers, and PHI.

77. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[39]

---

[36] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER HEALTH NEWS (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

[37] *See* Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[38] *Id.; see also Healthcare Data Breach: What to Know About Them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/

[39] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

78.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

79.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[40]

### G. Defendants Fail to Comply with FTC Guidelines

80.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

81.     In 2016, the FTC updated its publication, *Protecting Personal Information*: *A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[41]

---

[40] U.S. GOV'T ACCOUNTABILITY OFFICE, *Report to Congressional Requesters*, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[41] *Protecting Personal Information*, *supra* note 17.

82. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[42]

83. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

84. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

85. These FTC enforcement actions include actions against healthcare entities that fail to adequately protect patients' data, like Defendants. *See, e.g., In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[42] *Id.*

86. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

87. Defendants failed to properly implement basic data security practices.

88. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

89. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of their patients; Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**H. Defendants Fail to Comply with HIPAA Guidelines**

90. Defendants are covered businesses under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

22

91. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[43] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

92. HIPAA's *Privacy Rule or Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

93. HIPAA's *Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

94. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

95. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

96. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

---

[43] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforce.

97. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

98. HIPAA and HITECH also obligate Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

99. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[44]

100. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

---

[44] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

101. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

102. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[45] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[46]

## I. The Harm Caused by the Data Breach Now and Going Forward

103. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your

---

[45] *Security Rule Guidance Material*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

[46] *Guidance on Risk Analysis*, *Security Rule Guidance Material*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html.

personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[47]

104. The types of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft.

105. Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

106. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

107. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[48]

108. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[49] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[50]

---

[47] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness  (last visited Mar. 20, 2026).

[48] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE BLOG (Feb. 1, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

[49] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.

[50] *Id.*

109.     PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[51] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[52]

110.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[53]

111.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[54] Defendants did not rapidly report to Plaintiff and Class Members that their Private Information had been stolen. Defendants notified impacted people nearly two months after learning of the Data Breach.

112.     As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiff and Class Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion

---

[51] *Id.*

[52] Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, *supra* note 31.

[53] *2019 Internet Crime Report Released*, FED. BUREAU OF INVESTIGATION (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion.

[54] *Id.*

of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further injurious breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff and Class Members' Private Information.

113. In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

114. Defendants disregarded the rights of Plaintiff and Class Members by (a) intentionally, wilfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their network servers were protected against unauthorized intrusions; (b) failing to disclose that they did not have adequately robust security protocols and training practices in place to safeguard Plaintiff and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

115. The actual and adverse effects to Plaintiff and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud

and/or medical fraud directly or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach require Plaintiff and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiff and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

## J. Plaintiff's Experience

116. Plaintiff Terry Mccleave is a former patient of DHS, having last received medical services from it in 2025.

117. As a condition of receiving medical services, Plaintiff was required to supply Defendants with his Private Information—including his name, date of birth, Social Security number, medical record number, dates of service, health insurance identification number, and medical records.

118. Defendants were in possession of Plaintiff's Private Information before, during and after the Data Breach.

119. Plaintiff reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

29

120. Plaintiff greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

121. Plaintiff stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

122. To the best of Plaintiff's knowledge, his Private Information has not been compromised in a prior data breach.

123. As a result of the Data Breach, Plaintiff has spent considerable time researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff spent that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

124. As a consequence of and following the Data Breach, Plaintiff has experienced a significant uptick in spam calls, text messages, and emails.

125. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in notifying him of the fact Private Information was acquired by criminals as a result of the Data Breach.

126. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

127. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

128. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff; and (g) other economic and non-economic harm.

## CLASS ACTION ALLEGATIONS

129. Plaintiff brings this class action, individually and on behalf of the following Nationwide Class:

> All persons in the United States whose Private Information was compromised as a result of Defendants' Data Breach (the "Class").

130. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their, successors, assigns, or

other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

131. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

132. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

133. **Numerosity**: The Members of the Class are so numerous that joinder of all of them is impracticable. Upon information and belief, the proposed Class includes thousands of members.

134. **Typicality of Claims**: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had his Private Information compromised as a result of the Data Breach. Plaintiff is a member of the Class, and his claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to the harm suffered by all other Class Members, which was caused by the same misconduct by Defendants.

135. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

136. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein.

If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

137. **Predominant Common Questions**: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

    a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    c. Whether Defendants' storage of Plaintiff and Class Members' Private Information was done in a negligent manner;

    d. Whether Defendants had a duty to protect and safeguard Plaintiff and Class Members' Private Information;

    e. Whether Defendants' conduct was negligent;

    f. Whether Defendants' conduct violated Plaintiff and Class Members' privacy;

    g. Whether Defendants' conduct violated the statutes as set forth herein;

    h. Whether Defendants took sufficient steps to secure their past and present patients' Private Information;

    i. Whether Defendants were unjustly enriched; and

    j. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

138. Information concerning Defendants' policies are available from Defendants' records.

139. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

140. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

141. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class Against Defendants)**

142. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

143. Plaintiff brings this claim individually and on behalf of the Class Members.

144. Defendants knowingly collected, came into possession of, and maintained Plaintiff and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

145. Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff and Class Members' Private Information.

146. Defendants had, and continue to have, a duty to timely disclose that Plaintiff and Class Members' Private Information within their possession was compromised and precisely the types of information that were compromised.

147. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, HIPAA, and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

148. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their patients. Defendants are in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

149. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

150. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff and Class Members' Private Information.

151. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

   a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems; and

c. Failing to periodically ensure that their computer systems and networks had plans in place to maintain reasonable data security safeguards.

152. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff and Class Members' Private Information within Defendants' possession.

153. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff and Class Members' Private Information.

154. Defendants, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiff and Class Members that the Private Information within Defendants' possession might have been compromised and precisely the type of information compromised.

155. Defendants breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendants failed to implement proper data security procedures to adequately and reasonably protect Plaintiff and Class Members' Private Information. In violation of the FTC guidelines, *inter alia,* Defendants did not protect the Private Information they keep; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of their networks' vulnerabilities; and failed to implement policies to correct security issues.

156. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

157. For instance, HIPAA required Defendants to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendants have yet to notify Plaintiff or Class Members of the Data Breach.

158. Plaintiff and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

159. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

160. It was foreseeable that the failure to adequately safeguard Plaintiff and Class Members' Private Information would result in injuries to Plaintiff and Class Members.

161. Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff and Class Members' Private Information to be compromised.

162. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

163. Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the

actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

164. But for Defendants' negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

165. As a result of Defendants' failure to timely notify Plaintiff and Class Members that their Private Information had been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

166. As a result of Defendants' negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiff and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class Against Defendants)

167. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

168. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiff and Class Members' Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

169. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff and Class Members' Private Information and by failing to comply with industry standards.

170. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

171. Defendants breached their duties to Plaintiff and Class Members under HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class Members' Private Information.

172. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

173.     Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act, HIPAA, and similar state statutes were intended to protect.

174.     Moreover, the harm that has occurred is the type of harm the FTC Act, HIPAA and similar state statutes are intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

175.     As a result of Defendants' negligence *per se*, Plaintiff and Class Members have been harmed and have suffered damages including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class Against Defendants)**

176.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

177.     Plaintiff and Class Members conferred a benefit upon Defendants by providing Defendants with their Private Information.

178.     Defendants appreciated or had knowledge of the benefits conferred upon themselves by Plaintiff. Defendants also benefited from the receipt of Plaintiff and Class Members' Private Information.

179. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff and the Class Members' Private Information because Defendants failed to adequately protect their Private Information. Plaintiff and the proposed Class would not have provided their Private Information to Defendants had they known Defendants would not adequately protect their Private Information.

180. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by them because of their misconduct and the Data Breach they caused.

<u>COUNT IV</u>
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class Against Defendants)**

181. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

182. Plaintiff and the Class provided and entrusted their Private Information to Defendants. Plaintiff and the Class provided their Private Information to Defendants as part of Defendants' regular business practices.

183. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen, in return for the business services provided by Defendants. Implied in these exchanges was a promise by Defendants to ensure that the Private Information of Plaintiff and Class Members in their possession was secure.

184. Pursuant to these implied contracts, Plaintiff and Class Members provided Defendants with their Private Information. In exchange, Defendants agreed to, among other things, and Plaintiff and the Class understood that Defendants would: (1) provide services to Plaintiff and

41

Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff and Class Members' Private Information; and (3) protect Plaintiff and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards.

185. Implied in these exchanges was a promise by Defendants to ensure the Private Information of Plaintiff and Class Members in their possession was only used to provide the agreed-upon reasons, and that Defendants would take adequate measures to protect Plaintiff and Class Members' Private Information.

186. A material term of this contract is a covenant by Defendants that they would take reasonable efforts to safeguard that information. Defendants breached this covenant by allowing Plaintiff and Class Members' Private Information to be accessed in the Data Breach.

187. Indeed, implicit in the agreement between Defendants and Plaintiff and Class Members was the obligation that both parties would maintain information confidentially and securely.

188. These exchanges constituted an agreement and meeting of the minds between the parties.

189. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class Members would not have disclosed their Private Information to Defendants but for the prospect of utilizing Defendants' services. Conversely, Defendants presumably would not have taken Plaintiff and Class Members' Private Information if they did not intend to provide Plaintiff and Class Members with their services.

190. Defendants were therefore required to reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure and use.

191. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their Private Information.

192. Defendants breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff and Class Members' Private Information.

193. Defendants' failure to implement adequate measures to protect the Private Information of Plaintiff and Class Members violated the purpose of the agreement between the parties.

194. As a proximate and direct result of Defendants' breaches of their implied contracts with Plaintiff and Class Members, Plaintiff and the Class Members suffered damages as described in detail above.

<u>**COUNT V**</u>
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Class Against Defendant MRO)**

195. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

196. Defendant MRO entered into contracts, written or implied, with its Clients to perform services. Upon information and belief, these contracts are virtually identical between and among Defendant MRO and its Clients around the country whose patients, including Plaintiff and Class Members, were affected by the Data Breach.

197. In exchange, Defendant MRO agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

198. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered

43

into between Defendant MRO and its Clients. Defendant MRO knew that if it were to breach these contracts with its Clients, its Clients' patients—Plaintiff and Class Members—would be harmed.

199.    Defendant MRO breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

200.    Plaintiff and the Class were harmed by Defendant MRO's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

201.    Plaintiff and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and his counsel as Class Counsel;

B.    For an order declaring that Defendants' conduct violates the laws referenced herein;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For damages in amounts to be determined by the Court and/or jury;

E.   For an award of statutory damages or penalties to the extent available;

F.   For pre-judgment interest on all amounts awarded;

G.   For an order of restitution and all other forms of monetary relief; and

H.   Such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Andrew W. Ferich*
Andrew W. Ferich (PA I.D. No. 313696)
Brian J. Devall (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
aferich@ahdootwolfson.com
bdevall@ahdootwolfson.com

Benjamin F. Johns (PA I.D. No. 201373)
**SHUB JOHNS & HOLBROOK LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
Facsimile: (856) 210-9088
bjohns@shublawyers.com

*Attorneys for Plaintiff and the Putative Class*